**Affirmed in Part, Reversed and Remanded in Part, and Opinion filed October 30, 2018.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-17-00067-CV

---

### OCCIDENTAL ENERGY MARKETING, INC., Appellant

### V.

### WEST TEXAS LPG PIPELINE L.P., Appellee

---

**On Appeal from the 151st District Court
Harris County, Texas
Trial Court Cause No. 2014-73375**

---

## O P I N I O N

A shipper on a pipeline that transports natural gas liquids sued the common carrier that operates the pipeline asserting breach of contract, various tort claims, and claims for declaratory relief. The trial court granted the common carrier's summary-judgment motions, rendered judgment that the shipper take nothing, and made three declarations based on the common carrier's counterclaim for declaratory relief. We affirm in part and reverse and remand in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellee/defendant/counter-plaintiff West Texas LPG Pipeline L.P. owns and operates a pipeline for the transportation of natural gas liquids ("NGLs"). West Texas operates its pipeline as a common carrier. The pipeline is open for the transportation of NGLs for various shippers, and West Texas transports NGLs from various shippers at the same time. The shippers' NGLs are commingled into a common stream during transportation through the pipeline.

West Texas has filed a tariff with the Railroad Commission of Texas that governs intra-state shipments between Texas receipt points and destinations (the "Tariff").[1] The Tariff provides the rates that West Texas charges shippers for transporting NGLs on West Texas's pipeline. The Tariff consists of a "Rate Sheet," which lists the published rates that West Texas charges and a "Rules Sheet," which provides the terms and conditions for transporting NGLs on the pipeline. Each time a shipper nominates NGLs for transportation on the pipeline, the shipper agrees to the terms and conditions of West Texas's published Rules Sheet.

Appellant/plaintiff/counter-defendant Occidental Energy Marketing, Inc. is an energy marketing company that ships NGLs on West Texas's pipeline. At the destination point, West Texas delivers NGLs to Occidental's designated consignee. Occidental sometimes ships NGLs on West Texas's pipeline using the tailgate of the "Salt Creek Processing Facility" as the origin point and the "Lone Star Pipeline – Baden" in Martin County, Texas, as the destination point.

### *Claims and Counterclaims*

In December 2014, Occidental filed this lawsuit against West Texas asserting

---

[1] Though West Texas has filed various versions of the applicable tariff, the language at issue in this appeal is the same in each version of the tariff.

a breach-of-contract claim based on West Texas's alleged breach of its obligation under the Tariff to deliver to Occidental's consignee a volume of "NGL Mix"[2] equal to the volume West Texas received from Occidental at the origin point, net only the adjustments provided for in the Tariff. Occidental alleges that since October 2010, West Texas consistently has failed to deliver to Lone Star Pipeline, net any adjustments provided for in the Tariff, the total gallon volume of NGL Mix that West Texas received for Occidental's account at the Salk Creek Plant. Occidental alleges that in doing so, West Texas has breached various provisions of the Tariff, including Item 50(b). Occidental also asserted damage claims for (1) breach of a common carrier's duty of care, (2) negligence, and (3) conversion, as well as (4) a claim seeking declaratory relief. West Texas answered and asserted a counterclaim seeking declaratory relief as to its obligations under Item 50 of the Tariff and as to its alleged full discharge and satisfaction of all of its obligations under Item 50.

*Occidental's Motion for Partial Summary Judgment*

Occidental moved for a partial summary judgment limited to its declaratory-judgment claim and seeking a declaration that West Texas is obligated to deliver the same volume of NGLs to the Lone Star Pipeline delivery destination that West Texas received on Occidental's behalf at the Salt Creek Plant origin point, less undisputed adjustments provided for in the Tariff.

*West Texas's Motion for Partial Summary Judgment*

West Texas moved for a partial summary judgment, seeking dismissal of Occidental's breach-of-contract and declaratory-judgment claims, and judgment as a matter of law on West Texas's declaratory-judgment counterclaim. West Texas

---

[2] Under the Tariff, "NGL" is defined as "Natural Gas Liquids" and "Mix" is defined as "mixture of Components."

asserted the following summary-judgment grounds:

(1) Under the Tariff, Occidental, as the shipper, is solely responsible for timely balancing any accumulated "Component imbalances," and "Component imbalance" is defined as "Net Volume Delivered to Consignee in excess of, or less than, Net Volume received from Shipper for Delivery to that Consignee."

(2) The Tariff does not impose on West Texas a duty to balance differences between Net Volume Delivered to a Consignee and Net Volume received from Shipper for Delivery to that Consignee.

(3) West Texas discharged and satisfied all responsibilities and obligations under the Tariff by providing proper written notice to Consignees and Shippers.

(4) In the alternative, any damages to which Occidental may be entitled are limited to the period from December 2012 to the present.

*Trial Court's Rulings*

The trial court denied Occidental's summary-judgment motion, granted West Texas's motion, and made the following declarations:

(1) The Tariff obligates Occidental, as the Shipper, to timely balance any accumulated Component imbalance[,] defined as the Net Volume Delivered to Consignee in excess of, or less than, Net Volume received from Shipper for Delivery to that Consignee;

(2) West Texas has discharged and satisfied all responsibilities and obligations under the Tariff by providing proper written notice to Consignees and Shippers; and

(3) The Tariff does not impose on West Texas a duty to balance difference [sic] between Net Volume Delivered to a Consignee and Net Volume received from Shipper for Delivery to that Consignee.

West Texas moved for summary judgment as to Occidental's claims for breach of a common carrier's duty of care, negligence, and conversion. The trial

4

court granted this motion and rendered judgment that Occidental take nothing against West Texas. The trial court later rendered a final judgment in which the court awarded West Texas reasonable and necessary attorney's fees under section 37.009 of the Civil Practice and Remedies Code, "conditioned on West Texas ultimately obtaining affirmance of the Court's summary judgment ruling on the parties' competing declaratory judgment claims."

## II. Issues and Analysis

On appeal, Occidental asserts various appellate complaints, including the following:

(1) Under the Tariff's unambiguous language, the Tariff requires West Texas to deliver to the Consignee designated by Occidental the volume of NGLs that Occidental nominates for Delivery to that Consignee, subject to (1) adjustments provided for under Item 50(f), and (2) West Texas making Delivery out of a common stock of commingled NGLs.

(2) Item 50 requires the Shipper to resolve component imbalances but not volume imbalances.

(3) West Texas's construction of "Component imbalance" in the Tariff as meaning a volume imbalance is unreasonable.

(4) The trial court erred in construing Item 50(e).

(5) West Texas failed to prove as a matter of law that it gave notice under Item 50(c).[3]

---

[3] On appeal, West Texas asserts that Occidental has not challenged all possible grounds for the trial court's summary judgment and that Occidental has mischaracterized the trial court's summary judgment and thus has not challenged the summary judgment that the trial court rendered. Liberally construing Occidental's appellate brief, we conclude that Occidental adequately has briefed challenges to each independent ground for the trial court's order granting the motion for partial summary judgment filed by West Texas on March 7, 2016. *See Republic Underwriters Ins. Co. v. Mex–Tex, Inc.,* 150 S.W.3d 423, 427 (Tex. 2004).

**A.** **Are "Component imbalances" under Item 50 "adjustments provided for herein" under Item 50(b)?**

Occidental and West Texas advance different constructions of Item 50, which reads in its entirety as follows:

**ITEM 50    COMPONENT BALANCING AND DEMURRAGE**

(a)    Carrier will transport Natural Gas Liquids with reasonable diligence considering the quality of the Natural Gas Liquids, the distance of transportation, and other material elements.

(b)    Carrier will deliver a volume of Mix to the Consignee designated by Shipper equal to the Net Volume of Receipts less adjustments provided for herein.  The composition of the Mix can vary at origin, and Receipts from all Shippers will be commingled In Line Inventory.  Due to said commingling, Carrier cannot deliver Mix for a Shipper's account containing Components in the same proportion as contained in Receipts of Mix at point(s) of origin.

(c)    Carrier will:

  (1)    Notify each Consignee in writing each month of the Net Volume of Mix received from Shipper, less adjustments provided for herein, for Delivery to that Consignee;

  (2)    Notify Shipper in writing within five working days subsequent to the month of Delivery of Net Volume of Mix Delivered during the preceding month to each Consignee designated by Shipper. [sic]

  (3)    Notify in writing each Consignee and Shipper the Net Volume of Component imbalances. (A Component imbalance is defined as Net Volume Delivered to Consignee in excess of, or less than, Net Volume received from Shipper for Delivery to that Consignee).

(d)    Shipper(s) shall be solely responsible for bringing into balance in a timely manner any accumulated Component imbalances.

(e)    Upon furnishing notification as provided in (c) above, Carrier will have fully discharged and satisfied all responsibilities and obligations hereunder

6

(f)     Each Shipper will be required to furnish his pro rata share of Mix required for line fill and well stock. The volume will be based on Carrier's receipts by Shipper to total receipts. New Shippers will be required to deliver a Net Volume of Mix equal to their share of the line fill before any Deliveries to their Consignee(s) will he made.

(g)     After satisfaction of line fill requirements, Carrier may at any time after Receipt of consignment of Natural Gas Liquids nominate to the Consignee Mix from the common stream at point of destination. At expiration of twenty-four (24) hours after Carrier gives notice of nomination to Consignee, Carrier will assess a demurrage charge on all Natural Gas Liquids, nominated for Delivery and remaining undelivered, at the rate of [U] one cent (1¢) per barrel for each day of twenty-four (24) hours or fractional part thereof.

The Tariff provides the following definitions of terms used in Item 50:

Carrier [means] [West Texas] and/or pipelines participating herein.

Components [means] constituents of Natural Gas Liquids.

Consignee [means] party, including a connecting pipeline system, to whom Shipper has ordered Delivery of Natural Gas Liquids.

Delivery [means] transfer from Carrier at destination to Consignee.

. . .

In Line Inventory [means] Mix in Carrier's custody to be delivered to a Consignee after Receipt and before Delivery.

Natural Gas Liquids [means] natural gasoline, ethane, propane, isobutene, normal butane, and pentanes or mixtures thereof, recovered from gasoline recovery plants and gas recycling plants as from time to time defined by Gas Processor Association and meeting the specifications issued by Carrier.

NGL [means] Natural Gas Liquids.

Mix [means] mixture of Components. []

Net Volume [means] Component volume calculated to 60°F in accordance with the latest edition of [Gas Processors Association]

7

8173.

Receipt [means] transfer from Shipper at origin to Carrier.

Shipper [means] party who submits a nomination in writing to Carrier for the transportation of Natural Gas Liquids under the terms and conditions of this Rules Sheet.[4]

Occidental argues that, under the Tariff's unambiguous language, Item 50(b) requires West Texas to deliver to Occidental's designated Consignee the volume of NGLs equal to the volume of NGLs that Occidental nominates for Delivery to that Consignee, "less adjustments provided for herein."[5] Occidental construes the phrase "adjustments provided for herein" to mean the requirement in Item 50(f) that each Shipper furnish a pro rata share of Mix needed for line fill and well stock. Occidental argues that under the term's plain meaning, a "Component imbalance" under Item 50 occurs when the volume of an NGL constituent received from a Shipper for Delivery to the Shipper's Consignee differs from the volume of that NGL constituent Delivered by West Texas to that Consignee. Occidental agrees that under Item 50(d) the Shipper is solely responsible for balancing in a timely manner any accumulated imbalance in these volumes. According to Occidental, a "Component imbalance" under Item 50 does not occur when West Texas fails to deliver to Occidental's Consignee a volume of NGLs equal to the volume of NGLs that Occidental nominated for Delivery to that Consignee, "less adjustments provided for herein." Occidental asserts that under Item 50(e), if West Texas provides the notices required under Item 50(c), West Texas is relieved only of its obligations under Item 50. According to Occidental, even if West Texas gives all notices required under Item 50(c), West Texas still has obligations under Items 10, 40, and 80 to deliver the

---

[4] When we use one of these terms in this opinion, we will capitalize the first letter of each word to show that we are referring to the term as defined in the Tariff.

[5] Occidental also relies upon Items 10, 35, 40, and 80 of the Tariff.

8

specified volume of NGLs to the Consignee nominated by Occidental to receive that volume of NGLs.

West Texas asserts that, although the phrase "adjustments provided for herein" may include the requirement in Item 50(f) that each Shipper furnish a pro rata share of Mix needed for line fill and well stock, this phrase also includes Component imbalances under Item 50. According to West Texas, if West Texas delivers to Occidental's designated Consignee a volume of NGLs that is less than the volume of NGLs that Occidental nominated for Delivery to that Consignee, this under-delivery of NGLs falls within the plain meaning of the term "Component imbalance" as used in Item 50, and thus is one of the "adjustments provided for herein" under Item 50(b). West Texas argues that under Item 50(d), Occidental is solely responsible for balancing any accumulated Component imbalances, including such under-deliveries of NGLs.

If we were to adopt Occidental's construction of the term "Component imbalance," then volume imbalances would not fall within the scope of this term and could not be part of any "adjustments provided for herein." If we were to adopt West Texas's construction of the term "Component imbalance," then volume imbalances would fall within the scope of this term, and Occidental alone would be responsible for bringing into balance any accumulated volume imbalances. But, even under this construction, it would be unreasonable to interpret these volume imbalances as "adjustments provided for herein" to the Net Volume of Receipts under Item 50(b) and Item 50 (c)(1). No language in the Tariff states that any under-delivery or over-delivery of NGL volumes should be used as an adjustment under Item 50, and we conclude that under either side's interpretation of the Tariff, it would be unreasonable to construe such volume imbalances as adjustments. *See Hirschfeld Steel Co. v. Kellogg Brown & Root, Inc.,* 201 S.W.3d 272, 282 (Tex. App.—Houston

9

[14th Dist.] 2006, no. pet.).

We conclude that Component imbalances are not "adjustments provided for herein" under Item 50(b), and even under West Texas's construction of the scope of "Component imbalances," Item 50(b) still would require West Texas to deliver a volume of Mix to the Consignee designated by Occidental equal to the Net Volume of Receipts, less adjustments under Item 50(f), but without any adjustment based on volume imbalances. Thus, even under West Texas's construction of the definition of "Component imbalances," the trial court erred in granting summary judgment as to Occidental's breach-of-contract claim based on the first two summary-judgment grounds.

Nonetheless, under the unambiguous wording of Item 50(e), if West Texas gives the notices required by Item 50(c), then West Texas is deemed to have satisfied in full all responsibilities and obligations under Item 50(b). Thus, we address whether the summary-judgment evidence conclusively proves West Texas's entitlement to summary judgment on the ground that West Texas discharged all responsibilities and obligations under the Tariff by providing proper written notice to Consignees and Shippers.

**B.    Does the summary-judgment evidence conclusively prove that West Texas provided all notices required under Item 50(c)?**

Item 50(e) provides that if West Texas gives the notifications required by Item 50(c), West Texas "will have fully discharged and satisfied all responsibilities and obligations hereunder." The trial court implicitly granted summary judgment on the ground that West Texas discharged and satisfied all responsibilities and obligations under the Tariff by providing proper written notice to Consignees and Shippers under Item 50(c). On appeal, Occidental argues that the summary-judgment evidence does not conclusively prove that West Texas gave the notifications Item 50(c) required.

10

In a traditional motion for summary judgment, if the movant's motion and summary-judgment evidence facially establish its right to judgment as a matter of law, the burden shifts to the nonmovant to raise a genuine, material fact issue sufficient to defeat summary judgment. *M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 23 (Tex. 2000). In our de novo review of a trial court's summary judgment, we consider all the evidence in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). The evidence raises a genuine issue of fact if reasonable and fair-minded jurors could differ in their conclusions in light of all of the summary-judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007).

Under Item 50(c)'s unambiguous language, West Texas must give the following notices:

(1) written notice to each Consignee each month of the Net Volume of Mix received from Shipper, less "adjustments provided for herein," for Delivery to that Consignee,

(2) written notice to Occidental within five working days after the month of Delivery of Net Volume of Mix Delivered during the preceding month to each Consignee designated by Occidental, and

(3) written notice to each Consignee and to Occidental of the Net Volume of Component imbalances.

Occidental bases its claims on West Texas's performance under the Tariff since October 2010. For the purposes of our analysis, we presume, without deciding, that in the context of this case Item 50(c)(1) only requires monthly written notice to Occidental's Consignee of the Net Volume of Mix received from Shipper, less "adjustments provided for herein," for Delivery to that Consignee. West Texas did not purport to submit the actual notices under Item 50(c) that West Texas allegedly

11

provided from October 2010 forward. The summary-judgment evidence does contain some notices as well as deposition testimony from Roger Tisdale, Occidental's former Vice President of NGLs, that he is not aware of any complaint by Occidental against West Texas for not providing the notices required under Item 50(c)(2) or Item 50(c)(3). A former vice president's lack of awareness of a complaint by Occidental that West Texas failed to provide certain notices does not mean that Occidental has no such complaint, nor does the lack of awareness show that West Texas provided all notices required under Item 50(c).

West Texas also provided an affidavit from a Commercial Manager at Chevron Pipe Line Company (James Ramsey), who states that "[d]uring the time for which [Occidental] seeks damages, the Pipeline performed a system-wide accounting at the end of each month and delivered reports required by Item 50(c) of the [Tariff] to the shippers and destinations, respectively." According to Ramsey, West Texas "calculated and reported 'Component imbalance' by shipper and destination." On the issue of whether West Texas gave the notices required by Item 50(c), these conclusory statements do not suffice to support a summary judgment. *See Hall v. Bean*, 416 S.W.3d 490, 494 (Tex. App.—Houston [14th Dist.] 2013, no pet.); *Kaldis v. Aurora Loan Servs.*, 424 S.W.3d 729, 734 (Tex. App.—Houston [14th Dist.] 2014, no pet.). After reviewing the remaining summary-judgment proof under the applicable standard of review, we conclude that the proffered evidence does not prove as a matter of law that West Texas gave each of these three types of notices under Item 50(c) from October 2010 forward. *See Patel v. Harris County Appraisal Dist.*, 434 S.W.3d 803, 813–15 (Tex. App.—Houston [14th Dist.] 2014, no pet.). On appeal, West Texas asserts that for the purposes of this litigation, it does not matter whether Occidental's designated Consignee received the notices required in Item 50(c)(1). Even if this were true, the evidence does not prove as a matter of law that West Texas gave each of these types of notices under Item 50(c)(2)

and Item 50(c)(3) from October 2010 forward. *See id.*

On appeal, West Texas argues that because Occidental did not plead that West Texas failed to give the notices required under Item 50(c), West Texas did not have any burden to prove that it provided these notices. We disagree.

In its pleading asserting its counterclaims, West Texas asserted that each month it had given the notices required by Item 50(c). Occidental responded to these counterclaims with a general denial, denying all of the allegations in the counterclaims, including West Texas's allegation of compliance with Item 50(c). We conclude that Occidental had no obligation to affirmatively plead that West Texas failed to give the notices required under Item 50(c) and that Occidental's general denial put the matter in issue, thus requiring West Texas to prove this point in its motion for traditional summary judgment. *See Jernigan v. Bank One, Texas, N.A.*, 803 S.W.2d 774, 775 (Tex. App.—Houston [14th Dist.] 1991, no writ).

Because the summary-judgment evidence does not prove as a matter of law that West Texas gave each of the notices Item 50(c) required from October 2010 forward, the trial court erred in granting summary judgment as to Occidental's breach-of-contract claim on the ground that, under Item 50(e), West Texas discharged and satisfied all responsibilities and obligations under the Tariff by providing proper written notice to Consignees and Shippers under Item 50(c). *See Patel*, 434 S.W.3d at 813–15. Thus, even under West Texas's construction of the definition of "Component imbalances," the trial court erred in granting summary judgment as to Occidental's breach-of-contract claim based on the third summary-judgment ground.[6] Having concluded that the trial court erred in granting summary

---

[6] The trial court did not grant summary judgment based on the fourth ground, in which West Texas asserted in the alternative that any damages to which Occidental may be entitled are limited to the period from December 2012 to the present. Thus, we need not and do not address the fourth

judgment as to Occidental's breach-of-contract claim on all of the grounds on which the trial court impliedly rendered judgment, we sustain in part Occidental's second issue, and we reverse the part of the trial court's judgment in which it denies relief on this claim and renders a take-nothing judgment against Occidental on this claim.

## C.  Did the trial court err in making the three declarations?

In granting West Texas's summary-judgment motion, the trial court made the following three declarations as a matter of law:

(1) The Tariff obligates Occidental, as the Shipper, to timely balance any accumulated Component imbalance[,] defined as the Net Volume Delivered to Consignee in excess of, or less than, Net Volume received from Shipper for Delivery to that Consignee;

(2) West Texas has discharged and satisfied all responsibilities and obligations under the Tariff by providing proper written notice to Consignees and Shippers; and

(3) The Tariff does not impose on West Texas a duty to balance [the] difference between Net Volume Delivered to a Consignee and Net Volume received from Shipper for Delivery to that Consignee.

As discussed above, the summary-judgment evidence does not prove as a matter of law that West Texas gave each of the Item 50(c) notices from October 2010 forward, and therefore, the summary-judgment evidence does not conclusively prove that West Texas has discharged and satisfied all responsibilities and obligations under the Tariff by providing proper written notice to Consignees and Shippers. *See Patel*, 434 S.W.3d at 813–15. The trial court erred in making the second declaration above. *See WesternGeco, L.L.C. v. Input/Output, Inc.*, 246 S.W.3d 776, 782–83 (Tex. App.—Houston [14th Dist.] 2008, no pet.). We sustain the second issue in part, and we reverse the part of the trial court's judgment in which

ground.

14

it makes this declaration.

The other two declarations accurately describe provisions of the Tariff. In the first declaration, the trial court recites Occidental's obligation under Item 50(d), and the trial court correctly recites the definition of Component imbalance contained in Item 50(c)(3).

In the third declaration, the trial court states that "[t]he Tariff does not impose on West Texas a duty to balance [the] difference between Net Volume Delivered to a Consignee and Net Volume received from Shipper for Delivery to that Consignee." The Tariff defines a "Component imbalance" as "Net Volume Delivered to Consignee in excess of, or less than, Net Volume received from Shipper for Delivery to that Consignee." The phrase "difference between Net Volume Delivered to a Consignee and Net Volume received from Shipper for Delivery to that Consignee," used in the third declaration, tracks the definition of Component imbalance. Thus, the third declaration states that the Tariff does not impose on West Texas a duty to balance any Component imbalance.

The parties differ on the meaning of the term "Component imbalance." West Texas asserts that any failure on its part to deliver to Occidental's designated Consignee a volume of NGLs equal to the volume of NGLs that Occidental nominated for Delivery to that Consignee, "less adjustments provided for herein," falls within the plain meaning of the term "Component imbalance." Occidental disagrees, asserting that a "Component imbalance" does not occur when West Texas fails to deliver to Occidental's Consignee a volume of NGLs equal to the volume of NGLs that Occidental nominated for Delivery to that Consignee, "less adjustments provided for herein." Nonetheless, both parties agree that the Tariff does not impose on West Texas a duty to balance any Component imbalance.

Under Occidental's interpretation of the Tariff, Occidental has a duty to

15

balance in a timely manner any accumulated Component imbalances, although these imbalances do not include volume imbalances. According to Occidental, under Item 50(b) and other items in the Tariff, West Texas has a duty to deliver to Occidental's designated Consignee the volume of NGLs equal to the volume of NGLs that Occidental nominates for Delivery to that Consignee, "less adjustments provided for herein." If West Texas does not do so, then, under Occidental's interpretation, West Texas has breached its obligations under the Tariff. Nonetheless, Occidental does not assert that the Tariff requires West Texas to balance any volume imbalances. Under either party's interpretation of the Tariff, the Tariff does not impose on West Texas a duty to balance the difference between Net Volume Delivered to a Consignee and Net Volume received from Shipper for Delivery to that Consignee.

In the first declaration and in the third declaration, the trial court accurately describes certain aspects of the Tariff, and each declaration would be correct whether or not an under-delivery of NGLs by West Texas to Occidental's designated Consignee falls within definition of the term "Component imbalance." Without addressing the parties' competing constructions of this definition, we conclude that the trial court did not err in making the first and the third declarations.[7] *See WesternGeco, L.L.C.*, 246 S.W.3d at 785–87.

D. **May this court affirm the summary judgment because West Texas presented undisputed evidence that West Texas delivered to Occidental's Consignee a volume of NGLs that at least equaled the volume Occidental designated?**

On appeal, West Texas asserts that this court should affirm the trial court's

---

[7] In its opening brief on appeal, Occidental states that the first and third declarations largely track the Tariff's language and on their face do not resolve the parties' differing interpretations of the Tariff.

summary judgment because West Texas presented undisputed evidence that West Texas delivered to Occidental's Consignee a volume of NGLs that at least equaled the volume Occidental designated for Delivery. We may not affirm the trial court's granting of a summary-judgment motion based on a ground the movant did not expressly present in the motion. *See Henkel v. Norman*, 441 S.W.3d 249, 251 n.1 (Tex. 2014); *Lindsey Construction v. AutoNation Financial Servs.*, 541 S.W.3d 355, 362 (Tex. App.—Houston [14th Dist.] 2017, no pet.). We have reviewed West Texas's motion for summary judgment as to the breach-of-contract claim and the declaratory-judgment claims, and we conclude that West Texas did not expressly present this argument in the summary-judgment motion. Therefore, we may not affirm the trial court's summary judgment on the ground that the undisputed evidence shows West Texas delivered to Occidental's Consignee a volume of NGLs that at least equaled the volume Occidental designated for Delivery. *See Henkel*, 441 S.W.3d at 251 n.1; *Lindsey Construction*, 541 S.W.3d at 362.

**E.  Should this court reverse the trial court's awards of attorney's fees to West Texas under the Declaratory Judgments Act?**

In its final judgment, the trial court awarded West Texas reasonable and necessary attorney's fees under section 37.009 of the Civil Practice and Remedies Code for work in the trial court and on appeal. In its third issue, Occidental challenges these attorney's-fees awards. The trial court stated that all of the awards are "conditioned on West Texas ultimately obtaining affirmance of the Court's summary judgment ruling on the parties' competing declaratory claims." We are reversing part of the declaratory relief granted to West Texas, so this condition has not been satisfied. For this reason alone, we must reverse the trial court's attorney's-fees awards.

In any event, this court has determined that the trial court erred in making one

of the declarations in favor of West Texas, and we are reversing the trial court's judgment as to Occidental's breach-of-contract claim (for which Occidental seeks to recover attorney's fees), and remanding this contract claim and the declaratory-judgment claims for further proceedings. Our disposition on appeal substantially affects the trial court's judgment and so warrants reversal of the trial court's attorney's-fees awards, so that on remand the trial court can address each party's request for attorney's fees in light of the relief granted in the trial court's final judgment on remand. *See Chase Home Fin., L.L.C. v. Cal West. Reconveyance Corp.,* 309 S.W.3d 619, 634 (Tex. App.–Houston [14th Dist.] 2010, no pet.). Therefore, we sustain the third issue, reverse the trial court's judgment as to all attorney's-fees awards, and remand for further proceedings.[8]

## F.     May this court render judgment in Occidental's favor?

Occidental does not challenge the trial court's order granting West Texas's second motion for summary judgment as to Occidental's tort claims. Occidental does seek reversal of the trial court's judgment as to each party's declaratory-judgment claims and as to Occidental's breach-of-contract claim. Occidental also asks that we render judgment on liability as to the breach-of-contract claim and remand for trial on Occidental's breach-of-contract damages. Though the trial court denied Occidental's motion for summary judgment on its declaratory-judgment claim, Occidental did not seek summary judgment in this motion as to its breach-of-contract claim. Thus, we may not render judgment as to Occidental's breach-of-contract claim. *See Armour Pipeline Co. v. Sandel Energy, Inc*., 546 S.W.3d 455, 467 (Tex. App.—Houston [14th Dist.] 2018, pet. filed). Furthermore, Occidental has provided no analysis in support of any argument that the trial court erred by

---

[8] We have sustained Occidental's third issue and part of its second issue. We need not and do not address Occidental's first issue or the remainder of its second issue.

denying its summary-judgment motion. *See American Risk Ins. Co. v. Serpikova*, 522 S.W.3d 497, 505 n.7 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *San Saba Energy, L.P. v. Crawford,* 171 S.W.3d 323, 338 (Tex. App.—Houston [14th Dist.] 2005, no pet.). So, we are not in a position to render judgment in Occidental's favor. *See American Risk Ins. Co.,* 522 S.W.3d at 505 & n.7.

### III. CONCLUSION

Under either party's construction of the scope of "Component imbalances," Component imbalances are not "adjustments provided for herein" under Item 50(b), and Item 50(b) still requires West Texas to deliver a volume of Mix to the Consignee designated by Occidental equal to the Net Volume of Receipts, less adjustments under Item 50(f), but without any adjustment based on volume imbalances. Because the summary-judgment evidence does not prove as a matter of law that West Texas gave each of the notices required under Item 50(c) from October 2010 forward, the trial court erred in granting summary judgment as to Occidental's breach-of-contract claim on the ground that, under Item 50(e), West Texas has discharged and satisfied all responsibilities and obligations under the Tariff by providing proper written notice to Consignees and Shippers under Item 50(c). The trial court erred in granting summary judgment as to Occidental's breach-of-contract claim on all of the grounds on which the trial court impliedly granted summary judgment.[9]

Because the summary-judgment evidence does not prove as a matter of law that West Texas gave each of the notices required under Item 50(c) from October 2010 forward, and therefore, the summary-judgment evidence does not conclusively prove that West Texas has discharged and satisfied all responsibilities and

---

[9] Occidental argues that the trial court erroneously overruled its objections to parol evidence submitted by West Texas. To adjudicate this appeal, we need not address this argument.

obligations under the Tariff by providing proper written notice to Consignees and Shippers, the trial court erred in making the second declaration. The trial court did not err in making the first and third declarations.

We affirm the trial court's judgment as to Occidental's tort claims and as to the first and third declarations. We reverse the trial court's judgment as to the remainder of Occidental's and West Texas's declaratory-judgment claims and as to Occidental's breach-of-contract claim, and remand these claims for further proceedings. In light of our appellate judgment, we reverse the trial court's judgment as to all attorney's-fees awards and requests, and remand so that the trial court can address each party's request for attorney's fees in light of the relief granted in the trial court's final judgment on remand.[10]

/s/     Kem Thompson Frost
             Chief Justice


Panel consists of Chief Justice Frost and Justices Busby and Wise.

---

[10] We need not and do not address each party's arguments in support of the competing constructions of the definition of "Component imbalance" as used in Item 50.